UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| SWINOMISH INDIAN TRIBAL COMMUNITY and SQUAXIN ISLAND TRIBE, federally recognized Indian Tribes;<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL MARINE FISHERIES SERVICE and UNITED STATES FISH AND WILDLIFE SERVICE<br><br>Defendants. | No.<br><br><br>COMPLAINT |

**INTRODUCTION**

1.      The Swinomish Indian Tribal Community ("Swinomish") and Squaxin Island Tribe ("Squaxin") (collectively, "the Tribes") challenge the decision of the National Marine Fisheries Service ("NMFS") and the United States Fish and Wildlife Service ("FWS") (collectively, "the Services") to fully rescind the regulatory definition of the term "harm" under the Endangered Species Act ("ESA").  The final rule, "Rescinding the Definition of 'Harm' Under the Endangered Species Act," 91 Fed. Reg. 43300 (July 14, 2026), is arbitrary,

COMPLAINT                                  1                    **ZIONTZ CHESTNUT LLP**
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

capricious, and contrary to law, in violation of the Administrative Procedure Act, National Environmental Policy Act, and Endangered Species Act.

2. The definition of harm is legally significant because it is part of the statutory definition of "take." 16 U.S.C. § 1532(19). ESA Section 9 and rules issued under ESA Section 4(d) prohibit "take" of members of a species listed as threatened or endangered. 16 U.S.C. § 1538(a)(1). The "take" prohibition is the central enforcement mechanism of the ESA and has been instrumental in the protection and recovery of imperiled wildlife for over 50 years.

3. Since 1975, the Services have maintained a regulatory definition of harm that prohibits killing or injuring protected species by degradation of their habitat. The rescinded NMFS regulation, 50 CFR § 222.102, provided that the term "harm" means "an act which actually kills or injures fish or wildlife. Such an act may include significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding or sheltering." The FWS definition, 50 CFR § 17.3, is closely similar.

4. The rescinded definitions of "harm" make sense, are consistent with scientific consensus that species require habitat to survive, and reflect the plain language meaning of "harm." Polluting water, cutting down trees, or draining and filling wetlands in such a way that "actually kills or injures" members of an ESA-listed species undoubtedly "harms" that wildlife.

5. The rescinded definition is also consistent with the overall statutory scheme. When Congress passed the ESA in 1973, Congress recognized the primary driver of species extinction as "economic growth and development untempered by adequate concern and

COMPLAINT                                           2                          ZIONTZ CHESTNUT LLP

conservation."  16 U.S.C. § 1531(a)(1).  Congress likewise recognized the foundational importance of protecting the habitat of threatened and endangered species in order to stop species loss.  Indeed, the first listed purpose of the Act is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved."  16 U.S.C. § 1531(b).

6.    Up until today, the Services had effectively and consistently applied the regulatory definition of "harm" for more than 50 years across nine Presidential administrations.  During that time Congress never provided a revised definition of "take" or "harm," even though Congress was plainly aware of the Services' definition and otherwise substantively amended the ESA in 1978, 1982, 1988, and 2004.  Indeed, the 1982 amendments introduced "Habitat Conservation Plans" in ESA Section 10, 16 U.S.C. § 1539(a)(2), which Congress premised on an understanding that degradation of the habitat of ESA-listed species constitutes unlawful "harm" and thus "take" of those species.

7.    The Services' longstanding definition of "harm" was upheld by a 6-3 majority of the Supreme Court in *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687 (1995) ("*Sweet Home*").  In *Sweet Home*, the Services and Department of Justice defended the traditional interpretation of "harm" as consistent with the text and purpose of the ESA and decisively won.  In the past thirty years, federal courts have cited *Sweet Home* in more than 5,000 decisions, and the majority opinion remains good law.

8.    Nonetheless, the Services now rescind the definition of "harm," abandoning the ESA's plain language and statutory context, 50 years of consistent application, best available science, and Supreme Court precedent.  The Services' final rule summarily concludes that they have suddenly deemed the Supreme Court's longstanding majority opinion in *Sweet*

COMPLAINT                                3                    **ZIONTZ CHESTNUT LLP**
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

*Home* illegal.  The Services further state that "[i]n light of their determination of illegality, the Services have determined that the best path forward is to rescind the regulatory definition entirely— instead of keeping part of it—and to refrain from implementing a replacement definition."  91 Fed. Reg. 43302.

9.      While not promulgating a new regulatory definition into the Code of Federal Regulations, the Services through the final rule "herein adopt" "the role and meaning of the term 'harm' within the larger definition of 'take' [that] was expertly explicated by Justice Scalia in his *Sweet Home* dissent."  91 Fed. Reg. 43302.  Based on that rationale, "[t]he Services conclude that 'take' applies only to an 'affirmative act[] … directed immediately and intentionally against a particular animal—not [an] act[] or omission[] that indirectly and accidentally cause[s] injury to a population of animals.'"  91 Fed. Reg. 43306 (*citing* 515 U.S. at 719–20 (Scalia, J., dissenting)).

10.      In other words, the Services have decided that the losing position in *Sweet Home* now reflects the only legally permissible reading of the statute, even though the arguments the Services now support were rejected by the majority of the Supreme Court.  The Services' new interpretation of the term "harm" is limited to direct, intentional actions, such as shooting an animal, and does not apply to degradation or destruction of ESA-listed species' habitat that kills or injures members of that species.

11.      The Services' new narrow interpretation of the statute is a radical and arbitrary reversal without supporting rationale.  Historic fish spawning and rearing habitat has been drastically reduced from habitat destruction and conversion, and habitat degradation is a primary driver of the decline of salmon stocks in the Puget Sound region.

COMPLAINT                                          4                              **ZIONTZ CHESTNUT LLP**

12. The Services' new definition of "harm" will diminish and allow damage to ESA-listed species' habitat and is likely to reduce the requirement for regulated parties to provide habitat protection as mitigation for incidental take. These changes in turn will diminish the populations of ESA-listed species and impede recovery.

13. The loss of long-standing protection for the habitat of ESA-listed salmon species will injure the Tribes and their members. The Tribes and their members cherish the native ecosystems of which they have been a part for thousands of years. Like ESA-listed salmon, Tribal members value and rely upon cold, clear water, intact estuaries and floodplains, and mature forests. Harm to those previously protected habitats will harm the Tribe and its members.

14. The injury to ESA-listed species caused by the Services' new definition of "harm" injures the Tribes and their members' interest in fishing for salmon. The Tribes and their members have subsisted on salmon for thousands of years, and salmon are central to their diet, economy, lifeways, culture, and ceremonies. The decision will reduce habitat availability and quality for ESA-protected salmon, which in turn will reduce stocks of listed and non-listed fish and diminish the Tribe's fishing opportunities.

15. The Services' rescission and new definition is a lose/lose for the Tribes: in the Services' view, it will be unlawful for the Tribes to unintentionally catch a protected fish, but lawful for a developer to drain or degrade all the water that same fish needs to survive.

16. The challenged decision states that "in issuing an incidental take permit, the Secretary of the Interior will no longer consider the effects of a proposed action on the species' habitat, nor will the permit contain terms and conditions requiring permittees to take into account habitat modification and degradation when executing the permitted take." 91

COMPLAINT 5

ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

Fed. Reg. 43304. The Tribes will also be deprived of their ability to participate in permitting processes under ESA Section 10 that are brought about by the need for parties to obtain incidental take permits to degrade ESA-listed species' habitat, which the Services no longer view as necessary.

17.    The rule rescission violates the Administrative Procedure Act because it is arbitrary, capricious, and contrary to law. The failure to engage in government-to-government consultation with the Tribes, despite clear policies requiring such consultation and sacred trust obligations to the Tribes, was arbitrary and capricious.

18.    Despite the radical shift in policy and complete reversal of legal interpretation with dire environmental implications, the Services did not engage in any review under the National Environmental Policy Act ("NEPA") or consultation under ESA Section 7 prior to issuance of the final decision. These failures violated NEPA and the ESA.

19.    The Tribes request that the Court declare the challenged rule unlawful and vacate and set aside the agency action.

**PARTIES**

20.    Plaintiff Swinomish Indian Tribal Community is a federally recognized Indian nation organized pursuant to Section 16 of the Indian Reorganization Act of 1934, 25 U.S.C. § 5123, and is located on the Swinomish Reservation on Fidalgo Island in Skagit County of the State of Washington. The Tribe's mailing address is 11404 Moorage Way, La Conner, WA 98257.

21.    Since time immemorial, Swinomish and its predecessors have been stewards of the aquatic, marine, and terrestrial environments upon which the Swinomish peoples have depended for their economic, subsistence, religious, spiritual, and ceremonial livelihoods.

COMPLAINT                                        6                        ZIONTZ CHESTNUT LLP

Pacific Salmon and other marine resources have played a central role in the daily lives of Tribal members.

22.     The Swinomish Reservation is located at the mouth of the Skagit River, the largest river system draining to Puget Sound, and the only river in the continental United States that still has all species of Pacific salmon and steelhead spawning, rearing and foraging in its waters.

23.     Swinomish is a present-day political successor-in-interest to certain tribes and bands that signed the Treaty of Point Elliott, 12 Stat. 927 (1855), a treaty with the United States that established the Swinomish Reservation and that reserved to Swinomish other rights including without limitation the "right to take fish at their usual and accustomed grounds and stations." *United States v. Washington*, 459 F. Supp. 1020, 1039, 1041, 1084 (W.D. Wash. 1978).  Swinomish's usual and accustomed grounds extend throughout the Northern Puget Sound to Canadian border, the Skagit River and its tributaries, and the Samish River and its tributaries. *See United States v. Washington*, 459 F. Supp. at 1049. The species listed as threatened or endangered in these waters include Puget Sound Chinook salmon, Puget Sound steelhead, bull trout, and Southern Resident killer whales.

24.     As detailed in the declaration of Senator Tandy Wilbur filed in support of this Complaint, Swinomish's culture and economy rely on fishing. The regulatory definition of the term "harm" that protects habitat of listed salmonids and Southern Resident killer whales helps provide for consistent enforcement and helps protect Swinomish's Treaty fisheries.

25.     ESA-listed species in Swinomish's region are culturally significant and greatly valued by the Tribe and its members as part of the native ecosystem of which the Tribe has been a part for thousands of years.  The rescission of the definition of "harm" and adoption

COMPLAINT                                              7                        ZIONTZ CHESTNUT LLP

of the narrow definition from the *Sweet Home* dissent harms Swinomish's strong interest in the protection and recovery of ESA-listed aquatic and terrestrial species.

26. The rule change also causes economic injury to the Tribe and its members' because failing to prevent "take" of ESA-listed species in the form of habitat degradation will result in diminished populations of ESA-listed salmon stocks. The rule change inhibits species recovery, and recovery would allow the Tribe to once again fish for currently ESA-listed fish, such as Puget Sound Chinook salmon. The rule change will also affect Swinomish's ability to catch other treaty-resource fish both because fewer Chinook means less incidental take available when it fishes for mixed stock fisheries, and because non-ESA listed species depend on the same habitats as listed species.

27. Swinomish has invested significant resources in the recovery of listed species through scientific research and habitat restoration that will be undermined by the federal government allowing takes in the form of habitat degradation. The permitting processes associated with regulated entities obtaining incidental take authorization also provide Swinomish with important procedural rights. Regulated parties seek authorization for otherwise prohibited "take" by applying for permits under ESA Section 10 and ESA Section 7. During those processes, the Tribe often participates in government-to-government consultation with the Services, provides robust scientific input and comment, and is able to advocate for effective mitigation.

28. In addition, Swinomish has an interest in the rule change because it is regulated under the ESA as a project proponent. For example, Swinomish started one of the first Tribally run ports in the country. The Swinomish Port Authority recently carried out a project to build a boat ramp and short-term parking lot and replace moorage facilities.

COMPLAINT                                 8                    ZIONTZ CHESTNUT LLP

29.     The project is subject to ESA Section 9, as well as ESA Section 7's consultation requirements.  Because NMFS and FWS determined the project was likely to result in incidental take and other adverse effects to ESA-listed species and critical habitat, the agencies required Swinomish to provide mitigation. The mitigation measures included removal of pile, creosote and debris from waters adjacent to the Port, planting riparian vegetation, and installing stormwater buffers. The Tribe also had to provide a riparian enhancement project in an area that would be protected for up to 40 years.

30.     While the Tribe supports providing the mitigation, the Services' new definition creates uncertainty for Swinomish regulated activities.  The Tribe believes the statutory definition of "take" still prohibits habitat degradation, but the Services' new regulatory rescission and definition contend the opposite.

31.     Plaintiff Squaxin Island Tribe is a federally recognized Indian nation organized pursuant to Section 16 of the Indian Reorganization Act of 1934, 25 U.S.C. § 5123, and is located on the Squaxin Island Reservation in Mason County of the State of Washington. Squaxin's mailing address is 10 SE Squaxin Lane, Shelton, WA 98584.

32.     The Squaxin Island Tribe, also known as the People of the Water, are descendants of the maritime people who have lived, hunted, fished, and gathered along the shores of the southernmost inlets of the Salish Sea for thousands of years.  Squaxin's cultural and economic well-being depend upon the health and sustainability of Pacific Salmon and other freshwater and marine resources, which play a central role in the daily lives of Tribal members.

33.     The Squaxin Island Tribe's Reservation lands and water encompass Squaxin Island, including its tidelands and submerged lands, and off-Island Reservation lands and

COMPLAINT                                    9                      ZIONTZ CHESTNUT LLP

waters. The Tribal Center is located on a peninsula in Totten Inlet, between the outlets of Little Skookum and Kennedy Creeks.  Squaxin fishes in the shallow bays, estuaries, inlets and open Sound of Southern Puget Sound and in the freshwater streams and creeks draining into those inlets.  The species listed as threatened or endangered in these waters includes Puget Sound Chinook salmon, Puget Sound steelhead, bull trout, Southern Resident killer whales, and marbled murrelet.

34.      Squaxin is a present-day political successor-in-interest to certain tribes and bands that signed the Treaty of Medicine Creek, 10 Stat. 1132 (1854) ("Treaty of Medicine Creek" or "Treaty"), a Treaty with the United States that established the Squaxin Island Reservation and that reserved to Squaxin other rights including without limitation the "right of taking fish at usual and accustomed grounds and stations." *See generally United States v. Washington*, 384 F.Supp. 312, 378 (W.D. Wash. 1974); *United States v. Washington*, 459 F.Supp. 1020 (W.D. Wash. 1978).

35.      As detailed in the declaration of Joseph Peters filed in support of this Complaint, Squaxin's culture and economy rely on fishing.  The rescinded definition of the term "harm" to listed salmonids and Southern Resident killer whales helped provide for consistent enforcement and helps protect the Squaxin's Treaty fisheries.  The permitting processes associated with regulated entities obtaining incidental take authorization provide Squaxin with important procedural rights.

36.      The rescission of the definition of "harm" and associated reinterpretation of the ESA injures Squaxin and its members.

37.      An order from this Court setting aside the challenged agency action would redress the Tribes' injuries.

COMPLAINT                                           10                    ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

38.     Defendant National Marine Fisheries Service is an agency of the U.S. Department of Commerce. The Department has delegated to NMFS its responsibility for administering the ESA with regard to threatened and endangered marine species, including threatened Puget Sound Chinook salmon, Puget Sound steelhead, and Southern Resident killer whales.

39.     Defendant United States Fish and Wildlife Service is an agency of the U.S. Department of the Interior. The Department has delegated to FWS its responsibility for administering the ESA with regard to threatened and endangered terrestrial and freshwater species, including threatened bull trout.

40.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1362 because this action is brought by federally recognized Indian tribes and the matter in controversy arises under the laws of the United States.

41.     The Administrative Procedure Act authorizes courts to review agency actions and to hold unlawful and set aside final agency actions, findings, and conclusions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

42.     Under 5 U.S.C. §§ 701-706 and 28 U.S.C. §§ 2201-2202, this Court has authority vacate and set aside agency action, and to issue declaratory and other necessary and proper relief.

43.     Venue in this district is appropriate under 28 U.S.C. § 1391(e) because the Tribes reside in this district, a substantial part of the events or omissions giving rise to this case occurred in this district, and the Defendants are federal agencies.  The Swinomish Indian Tribal Community government is based on its Reservation located within Skagit

COMPLAINT                                           11                         ZIONTZ CHESTNUT LLP

County, and claims in this case arise in Skagit County. The Tribes believe assignment to a judge in Seattle is appropriate. *See* LCR 3(e)(1).

44. The Tribes are providing notice to the Services that they intend to sue the Services for violations of the ESA, based on the Services' failure to carry out required consultation under ESA Section 7. If those concerns are not resolved, the Tribes intend to amend this Complaint after 60 days or more to include the ESA claims.

## FACTS

### The Tribes

45. The Tribes' members exercise their Treaty fishing rights for sustenance, cultural purposes, and for their livelihoods as commercial fishers. Salmon is considered a way of life for the Tribes' members. The Tribes' members have always and will always fish for salmon.

46. The Tribes are adjudicated co-managers of Washington fisheries along with the Washington Department of Fish and Wildlife and in this capacity work to ensure protection and restoration of fishery habitats and resources. For decades, the Tribes have also been engaged in self-regulation of their own fisheries.

47. Judge Boldt in *United States v. Washington* understood the importance of salmon to the Tribes, and this was best exemplified when he said that the right to fish at their traditional fishing places was "not much less necessary to the existence of the Indians than the atmosphere they breathed." 384 F. Supp. 312, 331 (W.D. Wash. 1974) (quoting *United States v. Winans*, 198 U.S. 371, 381 (1905)).[1]

---

[1] The Tribes reference their respective Treaty rights as context and to demonstrate standing. The Tribes do not assert treaty rights claims in this case. The Tribes explicitly reserve any and all claims to or arising from the Tribes' respective treaty rights, including but not limited to claims of treaty interference and federally reserved fishing rights. Adjudication of the existence

COMPLAINT                                          12

ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

48.     Fishing is the primary means of subsistence of many of the Tribes' members as their livelihood and culture have been based on fishing since time immemorial.

49.     The act of fishing, circulation of harvest within the community, the dietary dependence upon the fishery's harvest, and the importance of salmon and other species to the Tribes' cultural and spiritual life, give treaty fishing rights a value that transcends normal economic dependence on fishing.

50.     In years past, the Tribes' members were able to fish for all the species of salmon: Chinook, sockeye, pink, coho, and chum.  Unfortunately, where before Tribal members used to be able to harvest year-round, now they are only able to fish a few weeks per year.  These limitations are due to two main factors: limited salmon runs, and tight restrictions on fishing imposed by the Services under the ESA to limit harm to listed species.

51.     The Services regulate and limit the Tribes' fisheries pursuant to statutes including the ESA by restricting the amount of impact tribal fisheries can have on listed species.  Fisheries are often restricted to short periods of time (days or even hours) in certain areas.  The Tribes carefully record impacts to listed species and stop or relocate their fisheries once thresholds are met.

52.     For the past fifty years, the regulation of the Tribes' fisheries has been paired with protection of fish habitat.  The Services have enforced ESA Section 9 to prohibit habitat degradation that impairs, injures or kills a member of a species listed as threatened or endangered.  Over time, this has helped slow the decline or in some instances restore stocks

or extent of the Tribes' federal rights is not at issue in this judicial review proceeding, and adjudication of such rights would exceed the permissible scope of this judicial review proceeding.

COMPLAINT                                    13                      ZIONTZ CHESTNUT LLP

of ESA-listed fish, which results in fewer restrictions on Tribal fisheries and greater harvest by Tribal fishers.  Habitat protection also benefits production of non-listed fish, which are caught as adults by Tribal fishers.

**The Importance of Habitat Protection and Restoration**

53.    There is strong scientific consensus that habitat loss is the most significant driving force behind species extinction worldwide.  That broad consensus is applicable to threatened and endangered fish and wildlife in Washington state.

54.    Habitat modification and degradation—including the related concepts of habitat loss, fragmentation, and isolation—impact members of threatened and endangered species in profound ways.  Broadly speaking, habitat loss may disrupt essential ecological functions such as breeding, feeding, and sheltering. Members of species experiencing habitat loss, fragmentation, and degradation may be disturbed in their day-to-day movements, such as nesting and foraging for resources.[2]

55.    Estuarine and nearshore habitats are especially important for juvenile Chinook salmon. These habitats provide essential rearing areas that support growth and improve marine survival.

56.    Over seventy percent (70%) of Puget Sound's historic tidal wetlands have been lost or degraded due to physical alterations including diking, channelization, and tidegate

---

[2] *See* Joern Fischer & David B. Lindenmayer, *Landscape Modification and Habitat Fragmentation: A Synthesis*, 16 Global Ecol. Biogeogr. 265 (2007), *citing* D. A. Saunders, *Food and Movements of the Short-Billed Form of the White-Tailed Black Cockatoo*. 7(2) Wildl. Res. 257 (1980); Gary W. Luck & Gretchen C. Daily, *Tropical Countryside Bird Assemblages: Richness, Composition, and Foraging Differ by Landscape Context*, 13(1) Ecol. Appl. 235 (2003).

COMPLAINT                                                    14                              **ZIONTZ CHESTNUT LLP**
                                                                                            2101 FOURTH AVENUE, SUITE 1230
                                                                                            SEATTLE, WASHINGTON 98121
                                                                                            TEL. (206) 448-1230; FAX (206) 448-1230

infrastructure.[3] These modifications reduce habitat connectivity and quality, limiting juvenile salmon access to productive floodplain environments and reducing the number of adult Chinook that return to spawning grounds. This habitat degradation has direct and indirect effects—both short-term and cumulative—on Southern Resident killer whale prey supply and overall population viability.

57.    The Tribes have taken an important leadership role in working to maintain and recover salmon stocks in the region, including all the habitat types they depend upon for their food web, and throughout their migration and life histories: marine benthic, eelgrass, nearshore and estuary, freshwater streams including water quality and instream flows, floodplain, side and off-channel habitats, wetlands, riparian and forests.

58.    As detailed in the examples below, the Tribes are involved in habitat protection and restoration in at least three major roles: funding and participating in scientific study and fisheries management; funding and carrying out habitat restoration efforts; and participation in processes resulting from implementation of ESA Section 7 and Section 10, which can authorize incidental take that would otherwise be unlawful under the traditional interpretation of ESA Section 9.

59.    Swinomish is a founding member of the Skagit River System Cooperative ("SRSC") (originally the Skagit System Cooperative from when it was founded in 1976 until

---

[3] Nelson, B.W., E.J. Ward, D.W. Linden, E. Ashe, and R. Williams. 2024. Identifying Drivers of Demographic Rates in an At-Risk Population of Marine Mammals Using Integrated Population Models. Ecosphere 15(2): e4773. https://doi.org/10.1002/ecs2.477; Fresh, K., M. Dethier, C. Simenstad, M. Logsdon, H. Shipman, C. Tanner, T. Leschine, T. Mumford, G.Gelfenbaum, R. Shuman, J. Newton. 2011. Implications of Observed Anthropogenic Changes to the Nearshore Ecosystems in Puget Sound. Prepared for the Puget Sound Nearshore Ecosystem Restoration Project. Technical Report 2011-03.

COMPLAINT                                    15                    ZIONTZ CHESTNUT LLP

2003), a fisheries and environmental science and research consortium between Swinomish and the Sauk-Suiattle Indian Tribe. SRSC is a highly respected entity with more than 25 highly qualified scientists and biologists with expertise in fish biology, hydrology, hydrogeology, restoration ecology, and environmental permitting and regulatory compliance.

60.     SRSC was the co-author of the 2005 Skagit Chinook Recovery Plan (the "Recovery Plan") with the Washington Department of Fish & Wildlife after Chinook salmon were listed as "threatened" in 1999 under the ESA.  The Recovery Plan was approved by NMFS/NOAA Fisheries.

61.     The Recovery Plan states that "habitat degradation and destruction of estuary, floodplain, riparian nearshore, eelgrass, and side/off channel habitats, temperature impaired water quality, low stream flows, and hydromodifications like dikes, levees and tidegates blocking fish access and cutting off historical habitat have caused the decimation of the ESA-listed Chinook and other salmon runs."  Degradation to these habitats affects Chinook recovery directly as well as the entire food web that they depend upon to feed and grow strong enough before they journey to the ocean.

62.     To assist in habitat restoration, Swinomish has recently completed a tidal restoration project along Swinomish Channel, and has two other estuary restoration projects underway, including at Similk Bay and along Swinomish Channel, totaling nearly 300 acres of estuary habitat.

63.     Swinomish participates in numerous processes associated with implementation of ESA Section 10 and ESA Section 7.

64.     For example, on April 22, 2024, NMFS issued a biological opinion, jeopardy determination, and incidental take statement for the No Name Slough tidegate replacement

COMPLAINT                                    16                        ZIONTZ CHESTNUT LLP
                                                                       2101 FOURTH AVENUE, SUITE 1230
                                                                       SEATTLE, WASHINGTON 98121
                                                                       TEL. (206) 448-1230; FAX (206) 448-1230

project.  Swinomish commented and consulted with NMFS on, and participated in, the ESA Section 7 consultation as a sovereign Tribe and co-manager of affected fisheries. In that process, Swinomish  advocated for habitat restoration to mitigate adverse effects and incidental take, including habitat degradation, that is caused by the continued presence of tidegates in the Skagit estuary.

65.    Non-federal agencies seeking incidental take authorization may submit a habitat conservation plan or safe harbor agreement under ESA Section 10.  Authorization is necessary for "incidental" take, and the associated conservation plan to "minimize and mitigate the impacts of such taking" may include "habitat acquisition and maintenance."  15 U.S.C. § 1539(2)(A); 16 U.S.C. § 1532(3) (defining "conserve" and "conservation").

66.    Swinomish has participated in ESA Section 10 processes, including the Forests and Fish Habitat Conservation Plan, which governs forestry activities on more than 10 million acres of private land in Washington.  The fundamental premise of the plan is that habitat degradation caused by logging and forest practices causes "take" of ESA-listed fish and upland species.

67.    Rescission of the harm rule risks undermining the implementation of the Habitat Conservation Plan, which provide regulatory certainty and needed protections for listed fish and Treaty resources.

68.    Squaxin also participates in ESA Section 7 and 10 review and consultation to protect treaty-guaranteed habitat and resources. Notably for section 7, in 2023, Squaxin consulted on the Joint Base Lewis-McCord Conservation Program pilot project. For Section 10, Squaxin participates in local Habitat Conservation Plans and the Forest and Fish Habitat Conservation Plan.

COMPLAINT

17

69.     Squaxin was a founding convener for four salmon recovery WRIAs (Water Resource Inventory Areas): 10/12 (governed jointly), 13, 14, and 15. The goal of these WRIAs is to ensure self-sustaining salmonid runs at harvestable levels through restoration and conservation of freshwater streams and rivers, marine shorelines, and natural processes, along with the careful use of hatcheries and responsible harvest.

70.     Squaxin was a co-author of the 2005 South Puget Sound Chinook and Bull Trout Recovery Plan, which was adopted by NOAA Fisheries in 2007.  A focus of the document is habitat degradation and restoration, as evidenced by the opening statement: "In South Puget Sound, human activities have dramatically disrupted the function of many natural processes. These disruptions, termed 'human-based stressors,' change habitat and, ultimately, the ecosystem that Chinook and bull trout have adapted to through evolutionary development. On a temporal scale, many of these human-induced stressors have been sudden, creating significant impacts that have led to declines in the viability of both species."

71.     Squaxin was a key stakeholder in crafting and reviewing the Green Diamond Habitat Conservation Plan, which protects 51 fish and wildlife species. The plan was adopted by NOAA in 2000, and Squaxin continues to participate in its implementation.

72.     Squaxin has worked with project partners to conserve over 24 miles of marine shoreline habitat critical for species survival. Select projects include Goldsborough Creek estuary, Bayshore Preserve, Twin Rivers Ranch, and Eagle Point in Oakland Bay, as well as seven projects in lower Eld Inlet, all of which are designed to benefit all salmonids including Chinook salmon and steelhead trout.

73.     Squaxin's freshwater conservation projects total over 1,500 acres and include Skookum Valley, the middle and upper Deschutes River, and eight projects in the

COMPLAINT                                            18

ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

Goldsborough Creek watershed, all designed to benefit salmon and trout, including ESA-listed Puget Sound Chinook and Puget Sound steelhead.

**The Endangered Species Act and "Harm Rule"**

74.     The Endangered Species Act Section 9, 16 U.S.C. § 1538, prohibits take of endangered species.  16 U.S.C. § 1538(a)(1)(B)-(C). Under the ESA, "[t]he term `take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).

75.     Congress enacted the ESA for a clear purpose: "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b).  The ESA's ultimate goal is recovery of listed species to the point where they no longer need ESA protection.  *Id.*; 16 U.S.C. § 1532(3).

76.     Congress' focus on ecosystems and habitat is evident throughout the ESA.  The definition of "conserve" and "conservation" includes "habitat acquisition and maintenance." 16 U.S.C. § 1532(3).  The first criteria for listing a species as threatened or endangered is "the present or threatened destruction, modification, or curtailment of its habitat or range." 16 U.S.C. § 1533(a)(1)(A).

77.      Concurrent with the listing of a species, the Services "shall…designate any habitat of such species which is then considered to be critical habitat."  16 U.S.C. § 1533(a)(3).  Critical habitat includes areas "on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection." 16 U.S.C. § 1532(5).

78.     ESA Section 7 regulates adverse modification of critical habitat as a mechanism to ensure a lack of jeopardy for populations of listed species.  16 U.S.C. § 1536(a)(2).  ESA

COMPLAINT                                    19                 **ZIONTZ CHESTNUT LLP**

Section 10 authorizes incidental take, in many instances based on preparation of a habitat conservation plan that "minimizes and mitigates, to the maximum extent practicable" the impacts of taking.  16 U.S.C. § 1539.

79.     Habitat protection was a paramount concern when Congress enacted the ESA, as demonstrated in both the legislative history and the text of the statute. In the seminal case *Tennessee Valley Authority v. Hill*, 437 U.S. 153 (1978) the Court considered likely harm to fish habitat caused by a proposed dam project.  The Court observed that "examination of the language, history and structure [of the ESA] indicates beyond doubt that Congress intended endangered species to be afforded the highest priorities," and the ESA was enacted to "provide a means whereby ecosystems upon which endangered species and threatened species depend may be conserved." *Id.* at 174.

80.     The Court further observed that "[t]he plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." *Id.* at 185.  As part of its analysis, the Court relied upon the harm rule, specifically citing the provision stating that habitat degradation may constitute "take."  *Id.* at 184 n.30 (noting that the term "harm" is "an act or omission which actually injures or kills wildlife, including acts which annoy it to such an extent as to significantly disrupt essential behavioral patterns, which include, but are not limited to, breeding, feeding or sheltering; *significant environmental modification or degradation which has such effects is included within the meaning of 'harm'*" (citing 50 C.F.R. § 17.3 (1976)).

81.     For over fifty years, harm has been defined by regulation to include "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavior patterns, including breeding, feeding, or sheltering," or a close

ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

variation of that definition. 50 C.F.R. § 17.3; 50 C.F.R § 222.102 (substantively identical NMFS regulation).  Known generally as the "harm rule" or "harm regulation," the inclusion of habitat degradation in the prohibition of the "take" of endangered species is fundamental to the ESA.

82.     In 1994, the Services published in the Federal Register "Endangered and Threatened Wildlife and Plants: Notice of Interagency Cooperative Policy for Endangered Species Act Section 9 Prohibitions," 59 Fed. Reg. 126 (Friday, July 1, 1994), stating that

> It is the policy of the Services to identify, to the extent known at the time a species is listed, specific activities that will not be considered likely to result in violation of section 9. To the extent possible, activities that will be considered likely to result in violation also will be identified in as specific a manner as possible.

83.     The Services have followed this policy, and in so doing consistently identified degradation of habitat as "harm" to and "take" of ESA-listed species.

84.     Puget Sound Chinook were listed as threatened on March 24, 1999 (64 Fed. Reg. 14308) and June 28, 2005 (70 Fed. Reg. 37160).  In the 1999 listing decision, NMFS noted that:

> a substantial amount of habitat throughout the Puget Sound region has been degraded or blocked by dams and other barriers. In general, upper tributaries have been negatively affected by forest practices and lower tributaries and mainstem rivers have been impacted by agriculture and/or urbanization. Diking for flood control, draining and filling of freshwater and estuarine wetlands, and sedimentation due to forest practices and urban development are cited as problems throughout the [Evolutionarily Significant Unit ("ESU")].

64 Fed. Reg. 14308, 14318.

85.     NMFS provided "Take Guidance," which states that the top listed causes of "take" were associated with habitat degradation:

ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

Activities that NMFS believes could potentially harm, injure or kill chinook salmon in the listed ESUs and result in a violation of section 9 of the ESA include, but are not limited to: (1) land-use activities that adversely affect chinook salmon habitat in this ESU (e.g., logging, grazing, farming, road construction in riparian areas, and areas susceptible to mass wasting and surface erosion); (2) destruction or alteration of chinook salmon habitat in the listed ESUs, such as removal of large woody debris and "sinker logs" or riparian shade canopy, dredging, discharge of fill material, draining, ditching, diverting, blocking, or altering stream channels or surface or ground water flow….

64 Fed. Reg. 14308, 14326.

86.    In the 2005 decision, NMFS concluded that "the Puget Sound Chinook ESU continues to warrant listing under the ESA as a threatened species."  70 Fed. Reg. 37192.  In the associated take guidance, NMFS quoted the harm rule (50 C.F.R. § 222.102) in full and repeated the habitat degrading activities identified in 1994 as the top likely causes of "take."  70 Fed. Reg. 37160, 37196.

87.    In 2006, NFMS proposed listing the Puget Sound steelhead as threatened.  In the proposed listing, which was finalized in 2007, the agency stated that:

Activities that we believe could potentially "harm" steelhead populations (see ESA 3(19) and 50 CFR 222.102 [harm]) in the proposed Puget Sound DPS [distinct population segment], and result in a violation of the section 9 take prohibition include, but are not limited to:

1. Land-use activities that adversely affect steelhead habitats in the Puget Sound area (e.g., logging, grazing, farming, urban development, road construction in riparian areas and areas susceptible to mass wasting and surface erosion);

2. Destruction/alteration of the steelhead habitats in the proposed DPS, such as removal of large woody debris and "sinker logs" or riparian shade canopy, dredging, discharge of fill material, draining, ditching, diverting, blocking, or altering stream channels or surface or ground water flow….

71 Fed. Reg. 15666, 15678 (March 29, 2006).

COMPLAINT                                22

ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

88.     In 2005, NMFS listed the Southern Resident Killer Whale as endangered.  The agency recognized both habitat degradation and indirect harm through reduction of prey availability as "take."  In the listing, NMFS identified:

> Activities that we believe could result in violation of section 9 prohibitions against 'take' of the Southern Resident killer whale DPS include, but are not limited to, the following: 1. Coastal development that adversely affects Southern Resident killer whales (e.g., dredging, land clearing and grading, waste treatment/disposal, pile driving)…4. Land/water use or fishing practices that result in reduced availability of prey species during periods when Southern Resident killer whales are present.

70 Fed. Reg. 69903, 69911 (November 18, 2005).

89.     FWS has also long understood habitat degradation to cause "take."  In 1999, FWS listed bull trout as threatened.  FWS stated that:

> The following actions likely would be considered a violation of section 9…Destruction or alteration of riparian or lakeshore habitat and adjoining uplands of waters supporting bull trout by timber harvest, grazing, mining, hydropower development, road construction or other developmental activities that result in destruction or significant degradation of cover, channel stability, substrate composition, temperature, and migratory corridors used by the species for foraging, cover, migration, and spawning.

64 Fed. Reg. 58910, 58929 (November 1, 1999).

**The Services' Radical Reinterpretation of the ESA and Harm Rule Rescission**

90.     Despite 50 years of consistent interpretation, the scientific consensus that habitat degradation injures ESA-listed species, and the 6-3 majority opinion in *Sweet Home* upholding the existing regulation, on April 17, 2025, in a Federal Register notice titled "Rescinding the Definition of 'Harm' Under the ESA," FWS and NMFS jointly proposed to fully rescind the definition of "harm" from 50 C.F.R. § 17.3 (FWS regulation) and 50 C.F.R. § 222.102 (NMFS regulation).

COMPLAINT                                          23                  ZIONTZ CHESTNUT LLP

91.     The only basis for the rescission was the Services' assertion that "[r]egulations previously promulgated by FWS expanded the ESA's reach in ways that do not reflect the best reading of the statute, to prohibit actions that impair the habitat of protected species." 90 Fed. Reg. 16102.  The Services newly asserted that "our existing regulations, which still contain the definition of 'harm' contested in *Sweet Home,* do not match the single, best meaning of the statute. As Justice Scalia's dissent in *Sweet Home* explains, the regulations' interpretation of the statutory language violates the *noscitur a sociis* canon, did not properly account for over a thousand years of history, and is inconsistent with the structure of the ESA." *Id.*

**Public Comment, and Lack of NEPA Review, ESA Consultation, or Government to Government Consultation with any Tribe**

92.     The Tribes timely submitted extensive comments opposing the proposed rescission, submitted via Federal eRulemaking Portal.

93.     Swinomish also submitted more than 20,000 pages of best available scientific and technical studies and reports, including 318 peer-reviewed studies.  The submitted studies demonstrate that the overwhelming consensus of the scientific community is that habitat degradation is the leading cause of species loss, and that species recovery is only possible through habitat protection and restoration.

94.     The Services received 357,698 comments, overwhelmingly in opposition to the proposed rescission and reinterpretation of the ESA.  According to analysis conducted by the New York Times, about 99 percent of the comments were against the change.[4]

---

[4] *See* "Trump, Ending Decades of Protection, Opens Wild Habitats to Drilling and Mining," July 10, 2026, available at:

COMPLAINT                                   24                    **ZIONTZ CHESTNUT LLP**
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

95.    At least fourteen tribes in addition to Swinomish and Squaxin located in Washington State commented in opposition to the rescission.  The tribes opposing the rescission include:  Cowlitz Tribe; Lower Elwha Klallam Tribe; Nisqually Indian Tribe; Nooksack Indian Tribe; Puyallup Tribe of Indians; Quileute Tribe; Quinault Indian Nation; Sauk-Suiattle Indian Tribe; Skokomish Indian Tribe; Snoqualmie Tribe; Stillaguamish Tribe of Indians; Tulalip Tribes; Confederated Tribes of the Umatilla Indian Reservation; Confederated Tribes and Bands of the Yakama Nation.  The State of Washington also submitted comments in opposition.

96.    Other tribes across the United States also submitted comments in opposition, including: Big Pine Paiute Tribe of the Owens Valley (CA); Bishop Paiute Tribe (CA); Cheyenne River Sioux Tribe (SD); Fallon Paiute Shoshone Tribe (NV); Hoopa Valley Tribe (CA); Nez Perce Tribe (ID); Confederated Tribes of Warm Springs (OR); and Pueblo of San Felipe (NM).

97.    Swinomish requested government-to-government consultation from the Services.

98.    The Tribes requested that the Services comply with National Environmental Policy Act (NEPA) by carrying out environmental review and ESA Section 7 by engaging in Section 7 consultation.

99.    NEPA "is our basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).  NEPA has two fundamental purposes: (1) to guarantee that agencies take a "hard look" at the consequences of their actions before the actions occur by ensuring that

---

https://www.nytimes.com/2026/07/10/climate/endangered-species-act-harm.html (last accessed July 13, 2026).

COMPLAINT    25

"the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," and (2) to ensure that "the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349-50 (1989). "NEPA emphasizes the importance of coherent and comprehensive up-front environmental analysis to ensure informed decision making to the end that 'the agency will not act on incomplete information, only to regret its decision after it is too late to correct.'" *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1216 (9th Cir. 1998) (internal citation omitted).

100.    Pursuant to NEPA,

all agencies of the Federal Government shall … include in every recommendation or report on … major Federal actions significantly affecting the quality of the human environment, a detailed statement … on (i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action

(including a "No Action" alternative), and other environmental implications of the action. 42 U.S.C. § 4332(2)(C). This environmental impact statement ("EIS") helps to ensure "that environmental concerns [will] be integrated into the very process of agency decision-making." *Andrus v. Sierra Club*, 442 U.S. 347, 350 (1979).

101.    "[B]y requiring agencies to take a 'hard look' at how the choices before them affect the environment, and then to place their data and conclusions before the public, NEPA relies upon democratic processes to ensure . . . that 'the most intelligent optimally beneficial decision will ultimately be made.'" *Or. Nat. Desert Ass'n v. BLM*, 625 F.3d 1092, 1099-1100 (9th Cir. 2008) (quoting *Calvert Cliffs' Coordinating Comm. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1114 (D.C. Cir. 1971)).

ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

102. NEPA recognizes the need for programmatic environmental review when connected actions under a federal program "will have a compounded effect on a region." *Nat'l Wildlife Fed'n v. Appalachian Reg'l Comm'n*, 677 F.2d 883, 888 (D.C. Cir. 1981); *see also Kleppe v. Sierra Club*, 427 U.S. 390, 400 (1976) (recognizing need for a programmatic EIS for federal coal leasing program); *City of Tenakee Springs v. Block*, 778 F.2d 1402, 1407 (9th Cir. 1985) ("Where there are large-scale plans for regional development, NEPA requires both a programmatic and a site-specific EIS.").

103. In the rule rescission, the Services asserted that the agency action did not require NEPA review because it was a nondiscretionary action compelled by the statutory text. 91 Fed. Reg. 43316. The Services asserted that in the alternative, the action was subject to categorical exclusions for procedural actions with overly broad or speculative environmental effects, citing 43 C.F.R. § 46.210(i) and other categorical exclusions. *Id.*

104. 43 C.F.R. § 46.210(i) applies to "[p]olicies, directives, regulations, and guidelines: that are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case."

105. The contention that this exclusion applies is incorrect. Among other reasons, the regulation expressly states that conditions listed under 43 C.F.R. § 46.215 do not qualify for categorical exclusion, and one of the listed actions is those that "[h]ave significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species or have significant impacts on designated Critical Habitat for these species." The

COMPLAINT                                27                    **ZIONTZ CHESTNUT LLP**
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

harm rule rescission and revised legal interpretation of the ESA have significant impacts on listed species.  As a result, the cited categorical exclusion does not apply.

106.    The Services also determined that the agency action did not require consultation under the ESA Section 7(a)(2), 16 U.S.C. § 1536(a)(2), based on the rationale that "[t]he Services' promulgation of rules that govern their implementation of the [ESA] is not an action that is in itself subject to the [ESA's] provisions, including section 7(a)(2)."  91 Fed. Reg. 43310.

107.    The U.S. Supreme Court has long recognized the "undisputed existence of a general trust relationship between the United States and the Indian people." *United States v. Mitchell*, 463 U.S. 206, 225 (1983). The trust duty commits the federal government to protect Indian tribes' rights, resources, and interests. *Cherokee Nation v. Georgia*, 30 U.S. 1, 2 (1831). In discharging this responsibility, federal agencies must observe "obligations of the highest responsibility and trust" and "the most exacting fiduciary standards." *Seminole Nation v. United States*, 316 U.S. 286, 296-97 (1942).

108.    To satisfy their trust obligations, agencies consult with sovereign Tribal nations on a government-to-government basis.  Executive Order 13175, Consultation and Coordination with Indian Tribal Governments, states *inter alia* that "no agency shall promulgate any regulation that has tribal implications, that imposes substantial direct compliance costs on Indian tribal governments, and that is not required by statute, unless…the agency, prior to the formal promulgation of the regulation…consulted with tribal officials early in the process of developing the proposed regulation."

109.    The Services are a signatory to Joint Secretarial Order 3403, "Joint Secretarial Order on Fulfilling the Trust Responsibility to Indian Tribes in the Stewardship of Federal

COMPLAINT                                                    28                    **ZIONTZ CHESTNUT LLP**
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

Lands and Waters." Pursuant to Joint Secretarial Order 3403, *inter alia*, the Services must "[e]nsure that all decisions by the Departments relating to Federal stewardship of Federal lands, waters, and wildlife under their jurisdiction include consideration of how to safeguard the interests of any Indian Tribes such decisions may affect."

110. Also in furtherance of their trust duties, "agencies must at least show 'compliance with general regulations and statutes not specifically aimed at protecting Indian tribes,'" including NEPA's requirement to prepare an EIS for major federal actions with potentially significant environmental effects. *Pit River Tribe*, 469 F.3d at 788 (quoting *Morongo Band of Mission Indians v. F.A.A.*, 161 F.3d 569, 574 (9th Cir. 1998)); *see also Quechan Tribe of Fort Yuma Indian Rsrv. v. U.S. Dep't of Interior*, 755 F. Supp. 2d 1104, 1110 (S.D. Cal. 2010) (stating that "[v]iolation of this fiduciary duty [to tribes] to comply with … NEPA requirements during the process of reviewing and approving projects vitiates the validity of that approval and may require that it be set aside").

111. On July 14, 2026, the Services published their final decision in the Federal Register. 91 Fed. Reg. 43300. The Services finalized the rescission of the regulatory definition of harm. In its place, the Services stated that "the role and meaning of the term 'harm' within the larger definition of 'take' was expertly explicated by Justice Scalia in his *Sweet Home* dissent— an interpretation which we have herein adopted." 91 Fed. Reg. 43302.

112. The Services did not carry out any analysis under NEPA or ESA Section 7.

113. The Services recognized the many requests for consultation but did not consult with any Tribe. Instead, the Services stated that "[t]his regulation, which removes the definition of 'harm' from 50 CFR 17 and 222, does not have direct, substantial effects on one

COMPLAINT                                    29                    **ZIONTZ CHESTNUT LLP**
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

or more Indian Tribes…" and that the Services "conclude that this regulation does not have 'tribal implications' under section 1(a) of E.O. 13175 and formal government-to-government consultation is not required by E.O. 13175 and related policies of the Department of the Interior and the Department of Commerce."  91 Fed. Reg. 43315-16.

## CAUSES OF ACTION

### I.    Violation of the Administrative Procedure Act

114.    Plaintiffs re-allege and incorporate each and every allegation set forth in this complaint.

115.    The Services' rescission of the harm rule, 50 C.F.R. § 17.3 and 50 C.F.R. § 222.102, associated revised legal interpretation of the Endangered Species Act, and adoption of the definition of "harm" from the dissent in *Sweet Home*, is a final agency action subject to judicial review pursuant to the Administrative Procedure Act. *See* 5 U.S.C. § 704.

116.    The Services' rescission of the harm rule, 50 C.F.R. § 17.3 and 50 C.F.R. § 222.102, associated legal interpretation of the Endangered Species Act, and adoption of the definition of "harm" from the dissent in *Sweet Home*, violates the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) because the agency action is arbitrary, capricious, and contrary to law.

117.    The Services did not provide adequate or reasonable rationale for their reversal of longstanding agency position, in violation of the Administrative Procedure Act.

### II.    Violation of the Administrative Procedure Act based on Failure to Consult with the Tribes

118.    Plaintiffs re-allege and incorporate each and every allegation set forth in this Complaint.

COMPLAINT                                             30                           ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

119.     The Services' decision that E.O. 13175 and related policies of the Department of the Interior and the Department of Commerce did not apply, and associated decision to reject Swinomish's request for consultation, and generally to not conduct government-to-government consultation with affected Tribes, is arbitrary, capricious, and contrary to law.

## III.   Violation of the Administrative Procedure Act based on Violation of the National Environmental Policy Act

120.     Plaintiffs re-allege and incorporate each and every allegation set forth in this Complaint.

121.     The Services' rescission of the harm rule, 50 C.F.R. § 17.3 and 50 C.F.R. § 222.102, associated legal interpretation of the Endangered Species Act, and adoption of the definition of "harm" from the dissent in *Sweet Home*, is a "major federal action" that requires review under the National Environmental Policy Act, 42 U.S.C. § 4332.

122.     The Services' failure to carry out NEPA review, and associated application of a categorical exclusion, violated NEPA and therefore is contrary to law under the Administrative Procedure Act.

123.     The Services' failure to comply with NEPA violated their trust duties to the Tribes.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

1.     A declaration that the challenged agency action is unlawful and invalid.

2.     An order setting aside the challenged agency action.

3.     Injunctive relief enjoining implementation of the new rule and requiring restoration of the rescinded rule.

ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

4.    A declaration that the term "take" under the ESA includes indirect harm, including degradation of habitat that actually kills or injures members of the species listed as threatened or endangered under the Endangered Species Act.

5.    An award of costs and attorneys' fees as authorized under the Equal Access to Justice Act (EAJA) or any other applicable law.

6.    Any other relief the Court determines is just and proper.

Respectfully submitted this fourteenth day of July, 2026.

/s/Wyatt Golding
Wyatt Golding, WSBA No. 44412

/s/Liliana Elliott
Liliana Elliott, WSBA No. 61946

/s/Eleanor Bohn
Eleanor Bohn WSBA No. 63894

ZIONTZ CHESTNUT LLP
2101 4th Avenue, Suite 1230
Seattle, WA 98121
wgolding@ziontzchestnut.com
lelliott@ziontzchestnut.com
ebohn@ziontzchestnut.com
T: 206-448-1230
F: 206-448-0962

/s/ Emily Haley
Emily Haley, WSBA No. 38284

/s/Weston LeMay
Weston LeMay, WSBA No. 51916

Swinomish Indian Tribal Community
Office of Tribal Attorney
11404 Moorage Way
La Conner, WA 98057
ehaley@swinomish.nsn.us
wlemay@swinomish.nsn.us
(360) 708-0391

*Attorneys for Plaintiff Swinomish Indian Tribal Community*

COMPLAINT    32    **ZIONTZ CHESTNUT LLP**
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

/s/Amalia R. Walton
Amalia R. Walton, WSBA No. 36754

Squaxin Island Tribe
3711 SE Old Olympic Hwy
Shelton, WA 98584
awalton@squaxin.us
(360) 432-1771 | Phone
(360) 432-3699 | Fax

*Attorney for Plaintiff Squaxin Island Tribe*

COMPLAINT                          33                    ZIONTZ CHESTNUT LLP