UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| SWINOMISH INDIAN TRIBAL COMMUNITY and SQUAXIN ISLAND TRIBE, federally recognized Indian Tribes;<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL MARINE FISHERIES SERVICE and UNITED STATES FISH AND WILDLIFE SERVICE,<br><br>Defendants. | No.<br><br>DECLARATION OF TANDY WILBUR |

I, TANDY WILBUR, state and declares as follows:

**<u>Background and Qualifications</u>**

1. I am Tandy Wilbur. I am an enrolled member of the Swinomish Indian Tribal Community (hereafter, "Swinomish"), an Indian tribe recognized under the laws of the United States government. My Tribal name is kaniʔtəd. I was born and raised on the Swinomish Reservation, currently reside on the


ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

Reservation, and have lived on or near the Reservation for almost all my life.

2. The Swinomish Reservation is located on Fidalgo Island in Puget Sound, in Skagit County, Washington. The Reservation is just north of the mouth of the Skagit River, the only river in Washington that still supports runs of all six species of Pacific salmon. Swinomish has approximately 1,200 Tribal members, most of whom live on or near the Reservation.

3. I am a current member of the Swinomish Senate, the governing body for the Tribe. I have held the office of Senator for a total of nineteen years.

4. I am one of the Tribe's fishermen and exercise the Tribe's Treaty fishing rights when our fisheries department opens areas to Treaty fishing for finfish and shellfish in the Tribe's usual and accustomed fishing areas. I began fishing full-time in 1990, when I was sixteen years old. I ran a boat for my uncle and had my own river skiff, in which I fished by myself. My great grandfather and grandpa fished, as did my uncle and my mother. Fishing was passed to them from generation to generation, and then to me. I currently have four fishing boats: a purse seiner (sixty-two feet) and three combination boats (thirty-six feet each) which are for crab, shrimp, diving, halibut, and on occasion gill netting for salmon.

5. In this declaration, I will explain my background, the importance



ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

of habitat protection for species listed under the Endangered Species Act ("ESA") to Swinomish, and why we are a party to this litigation. The Tribe is deeply invested in consistent and robust enforcement of the Endangered Species Act in order to protect Treaty resources, including salmon, salmon habitat, instream flows, water quality, restored estuaries and floodplains, and intact uplands. Diminution of the ESA's protections injures the Tribe.

6. My understanding is that the United States' rescission of the "harm rule" set forth in the Federal Register constitutes a formal change in the United States' interpretation and enforcement of the Endangered Species Act. The rule rescission and associated reasoning will likely serve to reduce the United States' enforcement of ESA Section 9 where a party harms listed species by degrading that species' habitat.

7. In my experience, individuals pursue activities and projects in the Skagit and Samish watersheds that degrade habitat that actively kills or injures wildlife. For example, excessive water withdrawals in tributaries to the Skagit River strand and kill fish during periods of low flow. I expect these and other activities to continue and likely increase in the future, in part because of the reduced regulation caused Services' rescission of the harm rule.

8. Reduced protection of habitat and associated salmon production in the near and long-term injures the Tribe and its Treaty-based fishing rights,


ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

which are legally protected property rights. Furthermore, the rule rescission and associated reasoning will likely reduce the need for parties to seek incidental take authorization, and thereby deprive the Tribe of important opportunities to participate in permitting processes and advocate for species and habitat protection. These harms would be redressed by an order from this Court invalidating the rule rescission and the associated interpretation of the Endangered Species Act.

9. I am currently employed by Swinomish as the Fisheries Manager, a position I have held since 2021. Prior to becoming the Fisheries Manager, I was the Assistant Fisheries Manager for seven years. In my current capacity I am responsible for the overall management and regulation of the Swinomish fisheries, including the off-Reservation Treaty rights fisheries. As Fisheries Manager I oversee a staff of fisheries biologists and technicians, manage all of the Tribal fisheries, participate in preseason planning and develop management plans for all fisheries, establish regulations for and open and close fisheries, issue various permits and licenses to Tribal fishers, and register fishing vessels.

10. In addition, a large part of my job involves discussions and negotiations with other tribes, the State of Washington (the "State"), the United States government, and international organizations regarding the regulation and conduct of the various fisheries. My work with four of these



ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

organizations is described in the following four paragraphs. A number of others could be listed as well.

11. At the local level, I serve on the Board of Directors for the Skagit River System Cooperative ("SRSC"), a fisheries and environmental science and research consortium between the Swinomish and the Sauk-Suiattle Indian Tribes. SRSC is considered a center of excellence in fisheries science, research and restoration. It has more than twenty-five highly qualified scientists and biologists with expertise in fish biology, hydrology, hydrogeology, restoration ecology and environmental permitting and regulatory compliance and works closely with Swinomish staff to pursue salmon recovery goals. SRSC was the co-author of the 2005 Skagit Chinook Recovery Plan[1] (the "Recovery Plan") with the Washington Department of Fish and Wildlife after Chinook salmon were listed as "threatened" in 1999 on the Endangered Species Act list.

12. The Recovery Plan was subsequently approved by NOAA Fisheries and remains the most technically accurate and updated scientific roadmap for recovery of ESA-listed Skagit River Chinook salmon. Dozens of peer-reviewed scientific studies, many authored by SRSC in collaboration with NOAA Fisheries scientists, since the Recovery Plan was adopted have been

[1] Eric Beamer, et al., Skagit River System Coop. & Wash. Dep't of Fish and Wildlife, *Skagit Chinook Recovery Plan* (2005).


ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

published that further strengthen the Recovery Plan's conclusions that there is too little estuary habitat and too little floodplain habitat to support Skagit Chinook salmon recovery.

13. At the intertribal level, the Northwest Indian Fisheries Commission ("NWIFC") is an entity formed by all twenty of the tribes in the State of Washington that have Treaty fishing rights. The primary mission of NWIFC is to assist and support its member tribes in their role as co-managers (with the State of Washington) in managing Treaty and non-Treaty fisheries that occur within State boundaries and territorial waters. NWIFC's staff of sixty-five performs a wide variety of functions in research, modeling, policy formulation, environmental and habitat protection, and just about anything else related to the tribes' treaty fisheries. Each tribe has a representative on the NWIFC Board. I serve as Swinomish's representative.

14. At the statewide level, I participate as a negotiator in the primary salmon management process, the "North of Falcon" process, in which the Washington Department of Fish and Wildlife and the tribes come together annually to decide on the harvest quotas and timing for all of the salmon fisheries within State boundaries and territorial waters, from the offshore limit of the State's jurisdiction to the terminus of each stream's salmon run. Each of the twenty tribal fisheries and all of the various state sport and commercial



ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

fisheries are included. The process results in a large List of Agreed Fisheries ("LOAF") that provides for the tribes and the State to each achieve the harvest of their 50% share of the harvestable surplus of each species of salmon. Other co-management processes result in agreed fisheries in the various species of shellfish in the various management regions.

15. I also work with the Pacific Salmon Commission, an important international body that affects Treaty fishing within State boundaries and territorial waters. The Fraser River Panel of that Commission oversees the harvest in the U.S. and Canada of Fraser River salmon, which run through U.S. waters on their way back to the Fraser.

16. In my capacity as Fisheries Manager and Assistant Fisheries Manager for Swinomish for over a decade, and in light of my service with various intergovernmental fisheries management agencies, I have become familiar with Swinomish fishers, Swinomish fishing practices, Swinomish history regarding the fishery, the role of fishing in the Tribal economy, the regulation and management of the Swinomish fishery, the legal and governmental framework in which the fishery operates, and the environmental and habitat threats to the health of the fishery.

17. In this declaration I describe the many ways in which the Services' decision to rescind the harm rule and adopt a new, narrower



ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

definition will injure my interests, the interests of other Tribal fishers, and the Tribe as a whole. Those injuries are likely to regularly recur because the Tribe is deeply committed to the protection of habitat of ESA-listed fish within the Tribe's usual and accustomed fishing areas, and we will always pursue fishing and other lifeways in these areas. I fish throughout the year in these areas whenever I can and dedicate my work to protecting salmon stocks and habitat used by ESA-listed fish. The Tribe also plans to continue to attempt to engage in permitting processes, such as the review and issuance of incidental take permits and authorizations, and associated government-to-government consultations.

## **Swinomish Treaty Fishing Rights**

18. In a series of treaties with the U.S. government in 1854 and 1855, the Indian tribes of Puget Sound and the Washington coast from Gray's Harbor north ceded their aboriginal lands to the U.S. and retained reservations of land along with hunting, fishing and gathering rights. These treaties are commonly referred to as "Stevens treaties" because the U.S. negotiator was Washington Territorial Governor and Indian Agent Isaac Stevens. Each of the treaties reserved to each tribe the right to fish in its "usual and accustomed grounds and stations," commonly referred to as "U&As." The term "fish" is broad and includes finfish, shellfish, and other aquatic animals.



ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

19. The treaty fishing rights of the tribes were comprehensively interpreted and decreed in a U.S. federal district court decision in 1974 commonly called the "Boldt decision," named after the judge who rendered it. This case laid down the basic framework for conduct of the treaty and non-treaty fisheries that has applied ever since. The court retained continuing jurisdiction which it exercises to this day, and the parties are able to avail themselves of the court to resolve new disputes if and when they arise. It is no small part of a tribal fisheries manager's tasks to appear in court or attend court-supervised mediations on fishing matters.

20. From a fisheries manager's perspective, the main rules pertaining to treaty fishing rights that affect the fishery relate to U&As, conservation, allocation, tribal self-regulation, and co-management. These principles will aid in understanding the tribal harvest data that comes later.

a) U&As. Each tribe has a court-defined area of U&A in which it can exercise treaty fishing rights. These areas are different for each tribe and overlap, requiring intertribal cooperation. As many as seven or eight tribes may have U&A in a given area; other areas may have just one or two tribes that fish in that location.

b) Conservation. The treaty tribes and State are not allowed to take as much as they want. Managers must ensure that the needs of


ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

conservation—the propagation of fish for the future—are met, and only the harvestable surplus after conservation needs are met may be harvested.

c) Allocation. The treaty tribes are allowed to take up to 50% of the harvestable surplus, and the rest is available for non-treaty fishers. Basically, State and tribal fishers each get half the harvest.

d) Tribal Self-Regulation. The courts have ruled that if a tribe is capable of regulating its own fishery consistent with conservation principles, it must be allowed to do so. The state can regulate tribal harvest only if there is a conservation concern that a tribe is incapable of addressing. For decades now, all of the treaty tribes in Washington have been self-regulating their own fisheries.

e) Co-management. The fifty-fifty allocation and tribal right to self-regulation led to the evolution of a co-management process under which the tribes and State reach agreement on harvestable surplus, treaty and non-treaty quotas and timing. The North of Falcon process described in paragraph 7 is the co-management process for salmon, and there are other joint management efforts in place for other species as well.

21. Swinomish traces its treaty fishing right to a particular Stevens Treaty, the Treaty of Point Elliott, Jan. 22, 1855, 12 Stat. 927. That Treaty also established the Swinomish Reservation, which has been home to descendants


ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

of certain Tribes and bands that signed the Treaty ever since. The fishing U&A established for Swinomish in the Treaty of Point Elliott extend throughout the northern Puget Sound to the Canadian border and the Samish and Skagit river systems. The waters in Swinomish's U&A contain ESA-listed species including Chinook, steelhead, bull trout, and Southern Resident killer whales.

22. Under the Treaty of Point Elliott and the Boldt decision, the Tribe has a reserved Treaty right to, and federally-adjudicated co-management responsibility for, all fish in its U&A, including ESA-listed fish subject to federal jurisdiction, as well as other fish that rely on the same habitat. The Tribe's Treaty fishing right includes a right to the fish themselves—it is a right to harvest, eat, and sell fish. The Treaty guarantees the Tribe a sufficient quantity of fish to ensure a moderate standard of living. *Washington v. Wash. State Com. Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 686 (1979). The Treaty also guarantees the Tribe protection of habitat necessary to provide those fish and prohibits structures that block fish access to habitat. *See United States v. Washington*, 853 F.3d 946, 966 (9th Cir. 2017), *aff'd by equally divided court in Washington v. United States*, 584 U.S. 837 (2018).

23. The Tribe's Treaty rights to fish and their habitat constitute a property interest held by the Tribe. *See Menominee Tribe of Indians v. United States*, 391 U.S. 404, 413 (1968). Treaty rights function akin to easements


ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

running with the lands or places they attach to, and are protected from federal, state, and private interference. *See United States v. Winans*, 198 U.S. 371, 381-82 (1905); *United States v. Oregon*, 718 F.2d 299, 304 (9th Cir. 1983). Swinomish's property interest in the fish guaranteed by the Treaty and the habitat necessary to provide those fish will be harmed by the rescission of the harm rule.

While the Tribe has an interest in this litigation arising in part from the Treaty of Point Elliott, the Tribe does not assert Treaty rights claims in this case. The Tribe explicitly reserves any and all claims to or arising from the Tribe's Treaty rights, including but not limited to claims of Treaty interference and federally reserved fishing rights. Adjudication of the existence or extent of the Tribe's federal rights is not at issue in this judicial review proceeding, and adjudication of such rights would exceed the permissible scope of this judicial review proceeding.

**<u>Swinomish Treaty Fishing—Commercial</u>**

24. Swinomish has gathered information on the economic benefit of its commercial Treaty fishery, some of which is summarized below.

25. Swinomish is today, and always has been, very much a fishing community. For context, in 2023, 101 members registered for salmon fishing, and 187 for Dungeness crab. In 2024, ninety-three members registered for



ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

salmon fishing, and 275 for Dungeness crab. That is around 20% of the Swinomish membership, one in every five Swinomish man, woman and child. Some of the fishers are engaged full time in the various Tribal fisheries, while others fish part time during certain seasons to supplement their income from other jobs. Most hire deckhands, who must be Swinomish members. While not every Swinomish person fishes, every Swinomish person benefits from the Swinomish fisheries because of millennia-old cultural traditions that ensure the harvest is spread throughout the community, particularly to elders and children who are not able to fish for themselves because of age or infirmity.

26. The total income to the Tribe from commercial finfish fisheries was $1,035,522 in 2022; $484,956 in 2023; and $584,748 in 2024.[2]

27. The total income to the Tribe from commercial shellfish fisheries was $8,904,014 in 2022; $6,864,508 in 2023; and $7,522,739 in 2024.

28. Since 1978, the Tribe has not issued a regulation opening a directed fishery on ESA-listed wild spring Skagit Chinook because of the severe decline in Skagit Chinook populations and the concomitant need for a conservation closure. As a result, Tribal members have been unable to harvest the most iconic and culturally important of all salmon species for nearly half a

[2] Because pink salmon only run every other year, there is a natural fluctuation in salmon fishery revenue every other year.



ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

century.

29. ESA regulation associated with Puget Sound Chinook and other ESA-listed species at times has dramatically reduced where and when we can fish for other, non-listed species such as chum, sockeye and pink salmon.

30. The Swinomish fishing fleet is locally based; 95% moored their boats on the Reservation and the rest at nearby Anacortes or La Conner. The harvest is much more widely marketed, however, with some of it delivered to Vancouver, B.C. and some to overseas markets, particularly in Asia.

31. Swinomish commercial fishers pursue every available commercial harvest: sockeye, pink, coho, chum, Chinook, steelhead, crab, shrimp, halibut, clams, oysters, sea cucumber, sea urchin, and geoduck. The species of primary cultural and economic importance are salmon, and especially Chinook salmon, followed by crab.

32. Swinomish members fish throughout the Swinomish U&As for all the species available in a particular area. The fishing is particularly heavy in the waters surrounding the San Juan Islands, the Strait of Juan de Fuca East, Haro and Rosario Straits, Boundary Pass, Saratoga Pass, and Skagit Bay.

33. The Swinomish fishery is dominated by small boats throughout its fishery. In the 2024-25 season, 91% of the Tribally-registered vessels in the Swinomish fleet (all Tribal fishing vessels must be registered) were under


ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

thirty feet in length. Only seven of the overall 173 boats were forty feet or longer.

34. Swinomish fishing methods vary with the fishing location and species being harvested. Fishers use pots for crab and shrimp, set-lines for halibut, seines for all species of salmon, and drift gillnets for Chinook, chum, and sockeye salmon. In addition, fishers dive for geoduck, sea cucumbers, and sea urchins and dig for clams and oysters.

35. The Swinomish community also benefits from the Tribal commercial fishery in another way. Since 1968 a fish processing plant has been operating on the Swinomish Reservation. While the products processed and sold have changed throughout the plant's fifty-seven-year history, the plant remains a critical part of Swinomish fishing operations and would most likely close if there were no Tribal Treaty harvest to process.

36. It is well-established that degradation of habitat will result in continued declines of ESA-listed salmon and steelhead stocks, and impede those stocks' recovery. These impacts will cause injury to Swinomish fishers and the Swinomish Tribe.

37. In summary, the Services' decision to rescind the harm rule and the associated protection of habitat for ESA-listed fish will reduce salmon stocks over time, and harm Swinomish fisheries. The Swinomish Treaty



ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

fishery generates sizeable economic value for Tribal members and our Tribal community which would be significantly adversely affected if ESA protections for the habitat that salmon need are diminished or removed. Since almost every Swinomish household includes a fisher, that food source and fishing income is diffused throughout the whole Tribal community. A decline in Tribal fishing would cause serious adverse effects on the Tribal economy and community.

**Swinomish Treaty Fishing—Subsistence and Ceremonial**

38. The economic impact of tribal treaty commercial fishing is very important to the tribes, including Swinomish, but it is not the only value of the fishery nor is it the most important one. The court decisions following the Boldt decision have drawn the contours of the tribal treaty fishing right and have identified four basic values associated with the treaty fishing right: 1) conservation value of the resource, 2) ceremonial, religious, and spiritual values; 3) subsistence; and 4) commercial value. As a fisheries manager I address the conservation value every day, and Swinomish has invested significantly in the conservation of the resource, the protection of critical habitat, and restoration of degraded or destroyed habitat. The previous section dealt with the commercial value of the right. I now want to take up the subsistence and ceremonial aspects of the Swinomish Treaty fishery.

39. Swinomish fishermen view ourselves as part of the ecosystem.



ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

Like the fish, our Tribal fishermen and Tribal members highly value intact and functioning marine and riverine ecosystems. We live and work in the Skagit watershed and visit it every day. We value clean water, intact and restored estuaries and floodplains, and preserved riparian corridors and uplands. The Services' rescission of the harm rule will harm me and other fishermen by allowing degradation of habitat that we greatly value, rely upon and work hard to protect.

40. The Tribe has a right to engage in subsistence fishing, meaning fishing for personal or household consumption and not for sale. Commercial fishing has a subsistence component, since all commercial fishers reserve from their catches fish for their families and to distribute to extended family, elders and others in need in the community. Sharing of the bounty of the sea is a deeply engrained cultural tradition of the Coast Salish tribes. It is particularly strong at Swinomish, where the bounty of the Skagit River, the adjacent tidelands, and the marine fisheries present an abundance of fisheries riches. Our people thrive as a community around the sharing of fish.

41. Like all of the other treaty tribes, Swinomish has a system of issuing permits for subsistence harvest of fish. These harvests are by nature small and make up a small portion of the Tribe's overall fishery. But the subsistence fishery is important to sustaining the circulation of fish throughout


ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

the community. Subsistence fisheries may be open when commercial fisheries are not, making fresh seafood products more readily available.

42. Subsistence on fish is much more important to Swinomish and other treaty tribes than it is to the general population. Fish and shellfish are a major part of the Swinomish diet. Swinomish conducted a scientific survey of its fish consumption. The summary of the results of that survey, *Swinomish Seafood Diet Survey 2004–2006*, showed that the Swinomish people eat over twice as much fish and shellfish as the general population. In addition, it revealed that Tribal members would like to eat even more, but are unable to do so for various reasons, including lack of access, falling abundance due largely to inadequate habitat, fear of pollution, and harvest time restraints. That subsistence and dietary relationship between the people and the Treaty fishing harvest is a strong strand of our culture. Swinomish would not be Swinomish without fishing and this marine diet.

43. The Treaty fishing right also includes the right to take fish for ceremonial purposes. This harvest directly addresses the ceremonial, religious and spiritual values of the Treaty fishing right. As the Fisheries Manager I manage these fisheries too. They take place under permits and the catch counts toward our allocation share. But it is as a community member and leader that I most appreciate the significance of the ceremonial fishery.



ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

44. Feasting on the bounty of sea and river, and particularly on salmon, is a central feature of almost every Swinomish ceremony or gathering, as is true throughout the whole Coast Salish culture. Some of the ceremonies mark important events for an individual or family—birth, death, naming ceremonies, marriage, and the like. They also feature prominently as the core of community events, such as the Coast Salish Gatherings, the Canoe Journey, and the First Salmon Ceremony. For example, at the First Salmon Ceremony recently held at Swinomish on May 14th, the whole community, staff and invited guests feasted on salmon, clams, mussels, shrimp, crab, and other fruits of the sea and then conducted a rite to ask for the plentiful return of the salmon and the safety of Swinomish fishers in the coming seasons. Ceremonies and gatherings are an integral part of our culture, and the ceremonial food is essential to the ceremonies.

45. The act of fishing, the circulation of harvest within the community, the dietary reliance upon the harvest, and the importance of salmon and other species to the Swinomish culture and spiritual life, give Treaty fishing rights a value that far transcends the economic value as a commodity. The Treaty fishing right was meant to preserve our culture and way of life revolving around fishing and the fish harvest. As a fisheries manager, I am mindful of the need to preserve the fishery in order to preserve



ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

our identity as a Tribe and our cultural lifeways.

46. The Services' decision to rescind the harm rule and adopt a narrower definition harms my interests and the Tribe's cultural and spiritual interests in the habitat of ESA-listed fish, in recovering ESA-listed stocks, and in our ability to harvest non-listed fish.

**Treaty Fishing Rights on the Brink**

47. In my twelve years as the Swinomish Fisheries Manager and Assistant Fisheries Manager, I have seen the continued struggle to divide up the few remaining fish. Our runs have collapsed, due largely to habitat degradation and destruction. Any additional harm to critical habitat will further exacerbate this problem and further erode our fisheries, our economy, and indeed our whole way of life. In 1975, the year after the Boldt decision, the treaty tribes collectively took just a few percent of the Washington salmon harvest. Now they regularly take their treaty entitlement of 50%, but the volume of salmon harvested is almost the same as it was in 1975 because nearly all salmon stocks are significantly diminished. My fellow managers and I have witnessed the drastic depletion of salmonid resources, and particularly listed Chinook, steelhead, and bull trout, despite the fact that our harvest has declined and our fisheries are managed very well to ensure adequate escapement and conservation of the resource.


ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

48. Today, we can catch far fewer salmon than previous generations, which impacts my and the Tribal community's ability to feed our families and practice our cultural lifeways. Recovering salmon is high on the Tribe's list of priorities because we are starting to lose fishermen due to the devastating declines in salmon populations. This loss breaks the generational cycle that has existed for millennia. Before, our earliest thoughts were on the water, with our parents, uncles and grandparents catching salmon. But with the plummeting salmon populations, some of our children are no longer following in our footsteps—with the result that we, as a Tribe, as a people, are threatened with losing a way of life—a way of life that has been with us for thousands of years.

49. As People of the Salmon, I and other Swinomish members have witnessed devastating decreases in the size of Salish Sea salmon runs in the last fifty years, and have experienced our livelihoods suffer as fewer fish are available and as fishing seasons have been shortened and closed. This loss has strained the Tribe's cultural lifeline and diminished Tribal members' overall health and well-being. The dramatic decline in salmon run sizes is perhaps most noticeable in Puget Sound Chinook populations. These fish are listed as threatened under the Endangered Species Act, and in order to protect them, Swinomish often has to curtail or eliminate our fishing for more abundant salmon species, such as pink salmon, to reduce our incidental effects on


ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

Chinook. And as much as I and other Swinomish members feel the loss of this iconic species, we know that the endangered Southern Resident killer whales—our local orcas—do too. We consider the orcas—or blackfish as we call them—our friends, our family, part of the whole web that connects us as a Tribe to all living things. To see them on the water, to have them come by our fishing boats—that is a magical experience that most of us have cherished memories of, but it happens very rarely these days because the blackfish are not doing well primarily because of the lack of Chinook to eat.

50. Habitat restoration and protection are essential to species recovery. Salmon need clean, clear, cold water in streams to spawn. The leading threat to listed salmon stocks is habitat degradation caused by development.

51. The Tribe has taken an important leadership role in working to maintain and recover salmon stocks in the region through habitat protection and restoration efforts because the best available science from the 2005 Skagit Chinook Recovery Plan over two decades ago made clear that habitat degradation and destruction of estuary, floodplain, riparian, nearshore, eelgrass, and side/off channel habitats, temperature impaired water quality, low stream flows, and hydromodifications likes dikes, levees and tidegates blocking fish access and cutting off historical habitat have caused the decimation of our ESA-listed Chinook and other salmon runs. Degradation of these habitats affects


ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

Chinook recovery directly as well as the entire food web that they depend upon to feed and grow strong enough before they journey to the ocean. It also affects Southern Resident killer whales that depend on Chinook as a food source, as well as ESA-listed steelhead and bull trout that rely on similar habitat.

52. Swinomish has invested significant time and resources into protection of salmon habitat. Among other efforts, Swinomish has advocated for decades to protect instream river flows in areas within our U&A, ensure federal, state, and local regulations are enforced and policies and plans adhere to best scientific and technical data, restore riparian, floodplain and estuary habitats, and protect nearshore habitat for salmon recovery in the Skagit basin, through significant policy, scientific, and legal efforts. The Tribe reviews all applications for individual permits to the U.S. Army Corps of Engineers, as well as all Nationwide Permit 3 and 13 applications, among others, to ensure that habitat is protected and adequately mitigated. The Tribe closely monitors groundwater applications and has invested in scientific research including the SRSC's Recovery Plan. Swinomish scientists continue to conduct extensive scientific monitoring of ESA-listed Chinook and other species, and have authored dozens of peer-reviewed scientific articles.

53. Swinomish has been dedicated to estuary habitat restoration in particular, knowing that it is a primary limiting factor to ESA-listed Chinook


ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

recovery. There is too little estuary habitat in the Skagit River delta, as approximately 85% of the historical estuary has been converted to over 60,000 acres of intensive agricultural land through an extensive series of dikes, levees and tidegates. The Recovery Plan indicates that about 2,700 acres of additional estuary habitat is required in order to support the 1.35 million additional Chinook smolts needed to achieve recovery. This acreage target for restoring historic estuary habitat that has been converted to agriculture or development back into estuary habitat is separate from, and in addition to, the need to mitigate for the impacts of new in-water development such as new tidegates, new dikes or new shoreline armoring.

54. The loss and degradation of habitat is the primary reason salmon have declined and continue to struggle to recover, despite fishing harvest restrictions. It is widely agreed among the Western Washington treaty tribes that the state and federal policy of "no net loss" of habitat has failed. New permits that require mitigation of adverse impacts to critical habitat have not kept up, resulting in a *net loss* of salmon habitat throughout Puget Sound. Rescinding the harm rule will drastically exacerbate the net loss of salmon habitat throughout Puget Sound, directly injuring the Tribe's Treaty rights by diminishing salmon returns and recovery efforts, and giving a free pass to development that directly and indirectly takes critical habitat for ESA-listed


ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

species. Swinomish is doing its part and has been leading by example. The Tribe currently has multiple estuary restoration projects in process on its Reservation, including converting part of a commercial golf course into estuary habitat, and converting revenue-generating agricultural lands into estuary habitat. The Tribe is willing to make these sacrifices because when completed, the projects will provide nearly 300 acres of new estuary habitat that directly benefits ESA-listed species. However, much additional work by the Tribe and others to do their part is needed to meet recovery goals in a science-based timeframe.

55. Swinomish is also engaged in implementation of incidental take permits ("ITPs"). For example, we participate in adaptive management for the Forests and Fish Habitat Conservation Plan. This process exists in large part due to the threat of enforcement of ESA Section 9 for habitat degradation caused by forest practices (logging, road building, etc.). The Tribe also monitors implementation of ITPs for all individual permits for new in-water structures that may be authorized by the Army Corps.

56. The harm rule rescission is supported by a new interpretation of the ESA that would only apply ESA Section 9 to "direct" harm or affirmatively killing or injuring the species, and not apply it to the far more common harm, which is indirect harm to the species caused by habitat degradation. We believe


ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

that this reasoning is contrary to the statute and unlawful. Nonetheless, it appears that the United States has changed its enforcement position and as a result, there is likely to be reduced enforcement of the ESA, reduced ability to participate in permitting processes, reduced requirements to avoid and mitigate for degradation to a species' habitat, and regulatory confusion.

57. The changes caused by the United States' action injure the Tribe and diminish its legally protected procedural interests under the ESA to participate in permitting processes, its ability to engage in government-to-government consultation on incidental take authorizations, and its property interests in the salmon that its Treaty guarantees. The changes do so by undermining the Tribe's protected legal interest both in salmon habitat (estuary, floodplains, water quality and quantity) and salmon themselves.

58. Additionally, Swinomish is subject to ESA requirements as a project proponent. For example, Swinomish established the Swinomish Port Authority, one of the first Tribally-run ports in the country, in 2020.

59. In 2022, the Port Authority received a federal grant to improve the port, including building a boat ramp, building a short-term parking lot, replacing a moorage float and replacing a fixed pier. The project is regulated under ESA Section 9 and required consultation with NMFS and FWS under ESA Section 7, which resulted in a finding that the project was likely to result


ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

in adverse effects and incidental take under the prior regulatory definition of "harm," including due to habitat modification. Because of the likely incidental take and other adverse effects on protected species and critical habitat, Swinomish was required to conduct mitigation measures, including removing piling and debris, some of which contained creosote, as well as planting riparian vegetation and installing vegetation buffers as stormwater protection.

60. The rescission of the harm rule and replacement with a narrower version that is contrary to the ESA creates uncertainty with respect to regulation of the Swinomish Port and other likely future projects.

61. In sum, over the near and longer term, there is no question that the Services' rescission of the harm rule will reduce salmon habitat protections and will reduce salmon stocks. I am very concerned about the removal of harm protections for ESA-listed Chinook, steelhead and bull trout, among other salmonid species. Anything that worsens habitat conditions will adversely affect the ESA-listed species upon which the Tribe has relied for thousands of years, and therefore will injure, diminish and harm the Tribe's ceremonial, subsistence, and commercial fisheries, and the Tribe's cultural lifeways. Further, removing ESA protections against harm caused by habitat degradation and destruction would undermine the Tribe's efforts to restore Chinook habitat and unduly put the burden more heavily on the Tribe to protect threatened



ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

species and habitats. The Tribe already invests significant resources towards salmon recovery, would need to invest even more resources, including money, staff, and Reservation lands and waters, to restore the needed habitat for listed species absent federal protections and cannot do enough on its own to meet species recovery goals.

62. In addition, there are many Treaty resources that the Tribe depends upon for its commercial, subsistence and ceremonial fisheries, including sockeye, coho, pink and chum salmon, halibut, shrimp, clams, sea cucumbers and geoduck. These species are not yet listed, but depend upon the same habitats as ESA-listed species, and so have also benefited from the protections against habitat degradation that the harm rule affords. I am very concerned that if these protections are diminished or eliminated, many other non-listed aquatic species may suffer and decline, which would have a direct detrimental effect on the Tribal community's economic, subsistence and ceremonial rights.

63. Today a significant salmon management concern centers on how to manage mixed-stock fisheries, where listed and non-listed species coexist when species' run times overlap. Every year, the Tribe is required to reduce its number of fishing days on otherwise-harvestable salmon to reduce incidental take of Chinook salmon, which reduces the Tribe's harvest and impairs the


ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

Tribe's property rights. For example, in 2023 and 2024, we had large returns of Baker River hatchery sockeye; however, because our ESA-listed Skagit Chinook salmon populations were too low and would be caught incidentally in the directed sockeye fishery, our Tribal fishers lost out on the opportunity to harvest thousands of pounds of sockeye for economic, subsistence and ceremonial purposes. This is not the first time this has happened.

64. If the degradation and destruction of habitat for ESA-listed species is allowed, it is often impossible, or can take many years, to restore that habitat. For example, in December 2023, an oil and gas pipeline leak caused significant pollution to a salmon stream that was legally temperature-impaired in the Skagit River watershed. The creek drains into the Skagit estuary. Because the petroleum product leaked into a grove of mature trees that provided shade to the temperature-impaired salmon stream, all of the trees had to be cut down. While trees were replanted, it will be decades before those trees provide the same benefits to salmon habitat and water quality that the mature trees did.

65. The decline of fisheries is a problem across almost all of our harvests, and does not just include salmon. But salmon is the bellwether species, and the health of the Swinomish community is directly linked to the health of the salmon in so many ways, because salmon is both food and spiritual nourishment for the Swinomish Tribal Community. I think we have


ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230

reached a tipping point, and the proposal to drastically reduce habitat protections for ESA-listed Chinook salmon and the Southern Resident killer whales dependent upon them as primary prey, as well as ESA-listed steelhead and bull trout, by eliminating the harm rule will further reduce, harm and injure the fish and shellfish that our Tribal members, ancestors, and entire culture have depended upon since time immemorial by allowing the further degradation and destruction of the habitat these species need to recover and thrive.

66. An order from this Court invalidating the rule rescission and the associated reasoning would redress the Tribe's injuries by keeping in place and/or reinstating the long-standing rule and protecting the habitat of ESA-listed species.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

EXECUTED this 13th day of July, 2026, at La Conner, Washington.

Tandy Wilbur, Swinomish Senator
Fisheries Manager



ZIONTZ CHESTNUT LLP
2101 FOURTH AVENUE, SUITE 1230
SEATTLE, WASHINGTON 98121
TEL. (206) 448-1230; FAX (206) 448-1230